(86 N. W. Rep. 864.)

---

First National Bank of St. Thomas *vs.* William Flath.

Opinion filed May 23, 1901.

**Action on Note—Burden of Proof—Bona Fide Purchaser.**

Where, in an action on a negotiable note by an indorsee, the burden to prove a good faith purchase has shifted to the plaintiff, by the introduction of evidence showing fraud between the original parties thereto, such burden is sustained prima facie, by showing a purchase for full value and before maturity.

**Knowledge of Suspicious Circumstances Will Not Defeat Recovery by Indorsee of Note.**

Good faith in the purchase of a negotiable note does not require the purchaser to make inquiries as to the purpose for which it was given or as to the existence of possible defenses. Bad faith is imputed only from knowledge or notice of the fraud or defenses. Mere knowledge of suspicious circumstances will not defeat a recovery.

**Indorsee in Due Course.**

It is *held* that the plaintiff is an indorsee in due course, and as such holds the note in suit freed from defenses existing between the original parties.

**Note and Mortgage Securing it—Not One Contract.**

Section 3900, Rev. Codes, which provides that "several contracts relating to the same matters between the same parties, and made as parts of substantially one transaction, are to be taken together," construed and *held* to establish a rule of interpretation merely, and that it does not unite several contracts into one contract. Under said section, a real estate mortgage and the note secured thereby do not constitute a single contract, but remain as separate contracts, except for purposes of interpretation.

**Mortgage Protected in Hands of Bona Fide Purchaser.**

In this state a mortgage securing a negotiable note shares the same immunity from defenses between original parties as the note secured.

Appeal from District Court, Pembina County; *Sauter, J.*

Action by the First National Bank of St. Thomas against William Flath and others. Judgment for plaintiff. Defendants appeal. Affirmed.

*Templeton & Rex,* for appellants.

*Bosard & Bosard,* for respondent.

YOUNG, J. Plaintiff seeks in this action to foreclose a mortgage upon certain real estate situated in Pembina county. The mortgage was executed and delivered by William Flath, one of the defendants herein, to William McBride, and was assigned by the latter to the plaintiff. The interest of the other defendants, Anton Flath and John Birkholz, in said real estate was acquired subsequent to the execution and recording of the assignment of the mortgage to plaintiff, and is not claimed to be in any way superior thereto. The judgment of the trial court was in all things favorable to plaintiff. Defendants appeal from the judgment, and demand a review of the entire case in this court.

The mortgage in suit was executed on June 2, 1898, to secure a promissory note for $1,200, of even date therewith, payable to the said William McBride, which note by its terms bore 12 per cent. interest from the date of its execution, and became due on November 1, 1898. On July 11, 1898, McBride sold and indorsed said note to plaintiff, and on the same day executed and delivered to plaintiff a written assignment of the mortgage securing the same, which is the mortgage involved in the action. Both the mortgage and the assignment were properly recorded at the date of their execution. There is no pretense that the note has been paid to the bank, but it is claimed by the defendants, and the evidence fully sustains them, that as to McBride they have a defense to it. It appears that McBride was surety for Flath on a number of notes which the latter owed to Noyes Bros. & Cutler, amounting in all to $1,176.80. The note and mortgage in question were given to McBride by Flath to indemnify him against liability arising out of such suretyship, and for no other purpose whatever. A separate written instrument was executed and delivered by McBride to Flath contemporaneously with the execution of the note and mortgage, which stated such purpose, and contained the further agreement that the mortgage was to be satisfied when the Noyes Bros. & Cutler notes were paid. It is undisputed that these notes have been paid, and that the payments were all made by Flath, except as to the sum of $50, as to which there is a conflict in the testimony. It is entirely clear, on this state of facts, that McBride could not recover were he the plaintiff in this action, except perhaps the disputed $50 payment. This is very properly conceded by counsel for plaintiff. But it is claimed that the plaintiff is an indorsee in due course, and that it holds the note in question entirely freed from the defense interposed. This presents the first question for consideration, namely, is the plaintiff an indorsee in due course? If so, the defense is not available.

Section 4884, Rev. Codes, was in force when the note was executed. It reads as follows: "An indorsee·in due course is one who in good faith in the ordinary course of business and for value before its apparent maturity or presumptive dishonor and without knowledge of its actual dishonor acquires a negotiable instrument duly endorsed to him, or endorsed generally, or payable to the bearer, or one other than the payee, who acquires such an instrument of such an indorsee thereof." Section 4885, Rev. Codes, being the section succeeding that just quoted, provides that such an indorsee acquires absolute title. The note in question is negotiable in form. It was properly indorsed, and was transferred to plaintiff before it was due. Under the general rule the burden would rest upon the defendants to show that plaintiff is not a good-faith purchaser, but it is contended that, under the facts of this case, the burden is shifted to plaintiff to establish its good faith. There is no doubt that, when fraud in the inception of a note is shown, the holder who claims to be a good-faith purchaser has the burden of showing it; that is, the burden shifts. This court has so held in a number of cases. See *Vickery* v. *Burton,* 6 N. D. 245, 69 N. W. 193; *Knowlton* v. *Schultz,* 6 N. D. 417, 71 N. W. 550; *Mooney* v. *Williams,* 9 N. D. 329, 83 N. W. 237. We find it unnecessary to decide whether the facts shown in this case are sufficient to cast the burden upon plaintiff to show its good faith. We will assume, for the purpose of the decision, that the rule is the same here as in cases where there is fraud in the inception or fraud in delivery of the note. The result is the same. The burden has been sustained. As has been stated, the note was purchased before maturity, and it was properly indorsed, and the evidence shows that plaintiff paid full value for it. This proof raises a presumption that it purchased in good faith and without notice of the alleged fraud. *Bank* v. *Sargent,* 85 Me. 349, 27 Atl. 192, 35 Am. St. Rep. 376. "The burden is *prima facie* sustained by the indorsee by showing that the note was indorsed to him for value before maturity. Nothing else appearing, a presumption arises that he purchased the note in good faith, without notice of the fraud." *Kellogg* v. *Curtis,* 69 Me. 212, 31 Am. Rep. 273. See, also, *Bank* v. *Foote,* 12 Utah, 157, 42 Pac. 205. The reason for the presumption is that it is not likely one would give full value for a note which he believed to be fradulent, taking the hazard upon himself, and because it would be difficult to prove good faith in any other way. Unless there are circumstances which seem to bring home notice of the fraud or illegality imputed, the requirement of further proof than the giving of full value seems unreasonably harsh and exacting. 1 Daniel, Neg. Inst. § 819. But plaintiff's good faith in the case at bar does not rest alone upon the proof of payment of full value. The president of the bank, who conducted the negotiations and made the purchase, testifies that the bank "had no notice or knowledge of what the note was given for, or that Mr. Flath claimed any defense to it of any kind," until long after the purchase was made. And this evi-

dence is undisputed. A great variety of facts are relied upon by appellants to show bad faith on the part of the bank. None of them go the extent of showing knowledge, and it is extremely doubtful whether there were any facts within the knowledge of the officers of the bank which would create even a suspicion of the purpose for which the note was given. But, even so, that is not enough. As was said in *Moorehead* v. *Gilmore*, 77 Pa. 118: "The latest decisions in England and in this country have strongly set in favor of the principle that nothing but clear evidence of knowledge or notice of fraud or *mala fides* can impeach the *prima facie* title of a holder of a negotiable paper taken before maturity. It is of the utmost importance to the commerce of the country that it should be strictly adhered to, however hard its operations in particular instances." The Supreme Court of Maine in *Farrell* v. *Lovett*, 68 Me. 326, 28 Am. Rep. 59, in announcing its adherence to the rule that knowledge of circumstances which might tend to arouse suspicions would not defeat a recovery, said: "The purchaser of a note before maturity has a right to assume that it is given on good consideration. The defendant by his signature gives notice to all the world of that fact, and promises when due that he will pay it to the person who may at the time happen to be the legal holder of the same. The purchaser is not bound to inquire. The maker has absolved him from that duty. Where he has paid full consideration for the note before due, fraud only will prevent his recovery, or gross negligence equivalent to fraud." See cases cited in opinion. Good faith did not require the plaintiff to make inquiry as to possible defenses, of which it had no notice either from the face of the paper or facts communicated at the time. *Howry* v. *Eppinger*, 34 Mich. 39; *Murray* v. *Beckwith*, 81 Ill. 43; 1 Daniel, Neg. Inst. § 775.

It is true McBride did not act in good faith towards Flath in selling the note, but it is not his good faith which is in question. In every case of this kind it is the bona fides of the indorser, that is in question. Daniel, Neg. Inst. § 770; *Helmer* v. *Krolick*, 36 Mich. 371. The direct evidence shows that McBride made no disclosure to Thompson of the secret purpose of the note, and all of the circumstances also go to show that he did not do so. It appears that Flath owed him about the amount of the note in suit, outside of the liability on his suretyship, and that it was unsecured. His purpose was to dispose of the note so that Flath would not be able to make a defense, which he could do so long as he held it. McBride is shown to have had many years of experience in handling commercial paper and as a bank cashier. Under these circumstances, we can indulge no inferences that he would disclose to the purchaser the existence of the secret agreement, and thus lay the foundation to defeat the very purpose he had in view. Every selfish motive prompted him to sell to a good-faith purchaser, for in no other way could he accomplish the result he had in view, which was to get what Flath owed him by this indirect method. But, as already said, it affirmatively ap-

pears that no such disclosure was made, and that plaintiff purchased in good faith. That plaintiff purchased the note before maturity is not disputed, and that it purchased for value and in the ordinary course of business is established by the evidence. McBride testifies that he received $1,200 for the note, and the president of the bank testifies that he gave $1,200 for it. On cross-examination of the latter, it was developed that payment was made by taking up a couple of demand notes which McBride owed the bank, and giving him credit for the balance, presumably on his bank account. It is contended by counsel for appellants that this is a mere credit on the books of the bank, and that it does not appear that the demand notes were surrendered, from which it is insisted that no value is shown to have been parted with by plaintiff. No effort was made by counsel for either party in their examination of the witnesses to develop anything further on the question of payment. The only evidence is that above stated, and it is exceedingly unsatisfactory. It is true the witnesses do not say in words that McBride's notes were given up by the bank, and that the credit was drawn out, but there is no other reasonable inference possible from the statement that $1,200 was paid and received. So, also, it appears that plaintiff purchased the note in suit in the ordinary course of business. This phrase is intended to describe a transfer according to the usages and customs of commercial transactions. Daniel, Neg. Inst. § 780. It was held in *Kellogg* v. *Curtis*, 69 Me. 212, that a purchase of a note before maturity for value constituted such a transaction. In *Kimbro* v. *Lytle*, 10 Yerg. 423, 31 Am. Dec. 585, "due course of trade" is said to be "where the holder has given for the note his money, goods, or credit at the time of receiving it, or has on account of it incurred some loss or incurred some liability." And the surrender of an antecedent debt as a consideration for the purchase of a negotiable note, under the decided weight of authority, is sufficient. *Bank* v. *McClelland*, 9 Colo. 610, 13 Pac. 723, and cases cited. This court had occasion to consider the meaning of the phrase "ordinary course of business" in *Christianson* v. *Association*, 5 N. D. 438, 67 N. W. 300, and held that it means "according to the usages and customs of commercial transactions"; and further held that the purchase of a negotiable note before maturity, for a valuable consideration, and duly indorsed by the payee, and delivered to the purchaser, is a purchase in the ordinary course of business. The purchase here in question clearly comes within the above language. It is urged by appellants' counsel that the transaction under consideration was not in the ordinary course of business, for the reason that the transaction was not a discount, within the meaning of the national banking act under which plaintiff is organized; and, further, that it was a taking of real estate security in violation of said act. It is true the bank was acting ultra vires in taking the mortgage, but it is well settled that "no one but the United States, in the person of the comptroller, can object; the transaction is perfectly good and enforceable between the parties." 1

Morse, Banks, § 75; *Bank* v. *Matthews*, 98 U. S. 621, 25 L. Ed. 188; *Fortier* v. *Bank*, 112 U. S. 439, 5 Sup. Ct. 234, 28 L. Ed. 764. The error in the contention lies in the assumption that a purchase, to be in the ordinary course of business, must be made in accordance with the particular rules, customs, or laws which govern the conduct of the purchaser. Such is not the law. The purchase is only required to be in accordance with "the usages and customs of commercial transactions," and when it is so made the fact that it was made in violation of some rule or law peculiar to the purchaser is of no importance.

One further question remains for consideration. It is urged that the mortgage, in any event, does not partake of the negotiable character of the note secured, and is therefore subject to equities existing between the original parties. This view has support in a number of cases, among which are the following: *Shippen* v. *Whittier*, 117 Ill. 282, 7 N. E. 642; *Hodson* v. *Glass Co.*, 156 Ill. 397, 40 N. E. 971. The decided weight of judicial opinion, however, is that a mortgage shares the same immunity from defenses as the note it secures. The Supreme Court of the United States so held in *Carpenter* v. *Longan*, 16 Wall. 271, 21 L. Ed. 313. Mr. Justice Swayne, speaking for the court in that case, said: "The question is whether an assignee, under the circumstances of the case, takes the mortgage as he takes the note, free from the objections to which it was liable in the hands of the mortgagee. We hold the affirmative. The contract, as regards the note, was that the maker should pay it at maturity to any bona fide indorsee, without reference to any defenses to which it might have been liable in the hands of the payee. The mortgage was conditioned to secure the fulfillment of that contract. To let in such a defense against such a holder would be a clear departure from the agreement of the mortgagor and mortgagee, to which the assignee subsequently in good faith, became a party. If the mortgagor desired to reserve such an advantage, he should have given a non-negotiable instrument. 'If one of two innocent persons must suffer by deceit, it is more consonant to reason that he who puts trust and confidence in the deceiver should be a loser rather than a stranger.' *Hern* v. *Nichols*, 1 Salk. 289. * * * All the authorities agree that the debt is the principal thing, and the mortgage an accessory. Equity puts the principal and accessory upon a footing of equality, and gives to the assignee of the evidence of the debt the same rights in regard to both. There is no analogy between this case and one where a chose in action, standing alone, is sought to be enforced. The fallacy which lies in overlooking this distinction has misled many able minds, and is the source of all the confusion that exists. The mortgage can have no separate existence. When the note is paid, the mortgage expires. It cannot survive for a moment the debt which the note represents. This dependent and incidental relation is the controlling consideration, and takes the case out of the rule applied to choses in action, where no such relation of dependence." See, also, § § 162-174, Coleb. Coll. Sec., and cases cited. Our adherence to the

last-named rule was announced in the case of *Christianson* v. *Association,* supra, but without discussion. The claim is now advanced that so far, at least, as this state is concerned, the question is settled against the view there announced by § 3900, Rev. Codes, which reads as follows: "Several contracts relating to the same matters, between the same parties and made as parts of substantially one transaction, are to be taken together." Counsel's contention is that, under this section, "the note and mortgage in law are but a single instrument"; and from this assumption the conclusion readily follows that the mortgage is subject to defenses. The point is made only as to the mortgage; but, if the premise is correct, it must also follow that all notes, although negotiable in form, which are secured by mortgages, whether real estate or chattel, are non-negotiable. The section relied upon, however, does not carry the meaning ascribed to it, which is that it unites the two or several contracts relating to a transaction into a single contract. The section is found in Article 7, Chap. 43, Civ. Code, and is one of twenty-seven sections, all relating to the interpretation of contracts. The language of the section is ambiguous, and the meaning somewhat obscure, but, when read with the sections preceding and following it, it is entirely clear that it is merely a rule of interpretation. The requirement that the several contracts are to be "taken together" does not mean that they are to be joined, and thereby become a single contract, but plainly means that they are to be "taken together" for the purpose of interpreting, either the transaction to which they relate, or the several contracts themselves. It does not purport to destroy the separate identity of the several contracts, and does not do so in effect.

Having reached the conclusion that the plaintiff is an indorsee in due course, and that the mortgage shares in the same immunity from equities existing between original parties as the note it secures, it follows that the judgment of the District Court must be in all things affirmed; and it is so ordered. All concur.