## Sarah Finegan v. Edward Green, Administrator.

### Gen. No. 12,779.

1. PROMISSORY NOTE—*when burden to show good faith in acquisition of, upon holder.* The general rule is that the holder of a note is presumed to be *prima facie* a holder for value, but where the maker shows that it was obtained from him or her by fraud, the burden of proof is shifted to the holder and the latter must show that he acquired it in good' faith for value, in the usual course of business, in such a way as not to create a presumption of knowledge of its invalidity.

Bill in chancery. Appeal from the Circuit Court of Cook county; the Hon. JULIAN W. MACK, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1905. Reversed and remanded with directions. Opinion filed December 11, 1906.

**Statement by the Court.** Appellant filed her bill of complaint alleging that she is the owner of lot 7, block 5, Adam Murray's addition to Chicago; that May 31, 1902, a trust deed was filed for record in Cook county purporting to be made by her and dated March 25, 1902, conveying said property to one James Dunn as trustee to secure a note for $520 bearing date March 25, 1902; purporting to be signed by her, payable to her own order two years after its date with interest at seven per cent. per annum and by her indorsed; that the trust deed purports to have been acknowledged before C. L. Waring, a notary public. Complainant alleges that she never signed said note or trust deed, never authorized any one to sign her name thereto, never appeared before C. L. Waring or any notary public and acknowledged said deed, never authorized any one to borrow money for her, never received $520 or any part thereof on said note, and that none of it was ever expended by her nor for her use or benefit, nor by her direction. She states that in March, 1904, one William L. Fitch, who claimed to be the owner of said note, presented it to her, demanding payment, and that this was the first notice or information she had of the

existence of said note and trust deed. She prays for
their cancellation and for general relief.

The defendant, William L. Fitch, answered denying
the material allegation of the bill and at the same
time filed a cross-bill to foreclose the trust deed, alleg-
ing that the note was due and payable by its terms.
Pending the determination of the cause in the trial
court, but after his testimony had been taken, said
Fitch died.

The court found that Mrs. Finegan borrowed the
amount of the note from said cross-complainant Fitch
and that she duly executed and acknowledged the trust
deed to secure its payment; dismissed the original bill
for want of equity, decreed payment of the amount
found to be due on the note with costs, solicitors' fees
and interest, and in default of payment directed sale
of the premises. From this decree the appeal is prose-
cuted.

BURTON & KANNALLY, for appellant.

McCLELLAN & SPENCER, for appellee.

MR. PRESIDING JUSTICE FREEMAN delivered the opin-
ion of the court.

It is contended in appellant's behalf that the decree
is contrary to the evidence. Her claim is that her
signature was obtained to the papers in controversy
by fraud and that they were turned over by one War-
ing, before whom as notary the acknowledgment pur-
ports to have been made, to Fitch to enable the latter
to get his friend Waring out of trouble on account of
money the latter owed Fitch's wife or the ''Wales Es-
tate,'' in which she was interested. In other words,
it is said that Waring with Fitch's knowledge and
connivance sought to pay his debt to Mrs. Fitch with
the fraudulently procured note and trust deed in con-
troversy.

It appears that prior to the date of the note and

trust deed appellant, being owner of the property in said trust deed described, gave to one C. L. Waring, a real estate agent of Chicago, since deceased, authority to attend to renting it and collecting the rents. Waring had before had something to do with other property belonging to Mrs. Finegan, had occupied a room in the house where she lived, of which he collected the rents, and had sold a lot for her. At the time when the note in controversy was dated, and the trust deed purporting to secure said note appears on its face to have been acknowledged before said Waring, the latter had been arrested at the instance of the wife of the cross-complainant, William L. Fitch, for alleged misappropriation of money procured from her through her said husband. According to the latter's testimony Waring continued until his death to be indebted to her or to the "Wales Estate" in which she was interested. There is evidence, however, tending to show that by the aid of Fitch, the cross-complainant, who, it is testified, swore that the money had been paid, Waring was released from arrest upon a false showing that he had paid the debt. Be that as it may, the evidence tends to show that Waring and Fitch, who, as the latter states, "had been friends for many years," continued in close relations, that Fitch used to call at Waring's office "nearly every day," and that he was apparently endeavoring to protect Waring from the consequences of the latter's alleged misconduct, even against his (Fitch's) own wife. Waring on his part was in financial trouble, indebted for money obtained through his friend Fitch, which he was unable to pay, under arrest and dependent upon Fitch's help for release. As agent for Mrs. Finegan in collecting rents, he had opportunities to obtain her signature to leases and receipts, and it is easily conceivable that he might so obtain it under the circumstances to a note and trust deed giving her the impression that she was signing a lease or receipt, and putting on his own false certificate of acknowledgment. Under these

circumstances the fact which Fitch himself states, that Waring was the immediate recipient of the money which Fitch claims to have loaned Mrs. Finegan on the note and trust deed in controversy, is not without significance. His statement is that on the 25th of March, 1904, he met Mrs. Finegan and Waring in the latter's office, that no one else was present, that Mrs. Finegan handed him the papers, that he handed her the money and she handed it to Waring. Absolutely no reason appears why she should have borrowed money to give to Waring or to place in his hands. There was a "Cadmus mortgage" for $200 on the property, which appellant testifies was being paid off from the rents which Waring was collecting for appellant, and which was actually released of record April 26, 1904, over two years after the date of the alleged loan in controversy. Fitch swears that he found this "Cadmus mortgage" had been paid prior to his making the alleged loan, when he says he looked the title up in the recorder's office and found it all right. None of the money in question appears ever to have been used by or for the benefit of Mrs. Finegan. The latter swears that she was not in Waring's office at the time nor about the time Fitch states the money was handed her by him and by her handed to Waring; that she never saw Fitch in Waring's office but once and that was some four years before, long prior to the date of the papers in controversy, when she went there in reference to papers of her own; that on that occasion Fitch passed through the office without speaking to any one, that she never saw him again until he came to her house demanding payment of this $520 note, and that she had no business with Waring other than relating to her rents, at the time of the alleged loan in question. She states that she cannot tell whether the signature to the note is her's or not, because she has no recollection of ever signing it and was never asked to; that she never saw Fitch with a dollar in his hand, that he never in all her life handed her $520, and that if the signature to the note is her's

it was not given to borrow money; that she cannot tell whether she ever wrote it or not, and that she never in her life acknowledged the trust deed.

There are circumstances which tend to discredit the testimony of cross-complainant Fitch. He does not satisfactorily explain how he obtained the money for the alleged loan. No one corroborates him in his statement that he drew it from the bank where it seems there was a deposit in a fictitious name of money belonging to the Wales Estate. If his statement that he did thus procure $520 for such loan is true, corroboration would have been easy by those whom he refers to as having given him the money. He seems to contradict himself in various ways. He never asked for nor received an abstract of the title. There is evidence tending to show that he stated he had paid this $520 to Waring and received the note and trust deed from the latter and not from Mrs. Finegan that he told different stories about the transaction at different times, that after he called on Mrs. Finegan and demanded payment of the note, he said he "was wondering whether or not Waring had beaten him out of this money as he did out of so much other money." We attach little weight to the claim that appellant admitted she owed this money and to the evidence introduced to sustain that contention.

The claim of appellant is not merely want of consideration, but that the note and trust deed are fraudulent, that if in fact the signatures are appellant's, they were obtained by fraud. The general rule is that the holder of a note is presumed to be *prima facie* a holder for value. But where the maker shows that it was obtained from him or her by fraud, the burden of proof is shifted to the holder and the latter must show that he acquired it in good faith for value in the usual course of business in such a way as not to create a presumption of knowledge of its invalidity. Hodson v. Eugene Glass Co., 156 Ill. 397-404. In the pres-

ent case we are of the opinion the cross-complainant has failed to rebut the evidence tending to show that the note and trust deed were fraudulently procured, and to show that he obtained them for value in good faith in a way not creating a presumption of knowledge of their invalidity.

An insuperable objection to the decree in this case, however, exists in the fact that the cross-complainant is not and does not pretend to be the owner of the note. He testifies that the money belongs to the Wales Estate, that "it didn't belong to me," that he gave "all over $520 to Edmund Wales when we got it from the bank because it was their money; it was all their money. I kept the $520 because he told me I could loan it." "This $520 still belongs to the Wales Estate." It thus appears that the cross-complainant had no title to the money purporting to be represented by the note and trust deed. The former purports to be payable to the order of the alleged maker and to be by her indorsed. Nothing appears on the note tending to show that the cross-complainant ever had any interest in it, and no one else claims to have. He testified that he had none. Yet in a court of equity this decree finds that his personal representative is the legal holder and owner of said note and trust deed in the face of the undisputed evidence to the contrary. Such a decree has no basis upon which to stand.

For reasons indicated the decree of the Circuit Court will be reversed and the cause remanded to that court with directions to dismiss the cross-bill and to enter a decree in favor of appellant granting the relief sought in the original bill of complaint.

*Reversed and remanded with directions.*