## WILLIAM E. PEASE ET AL.

### v.

## JOHN G. ROBERTS, Guardian, etc.

1. GUARDIAN — APPLICATION — CONCEALMENT OF MATERIAL FACTS FROM COURT.—When an applicant for guardianship letters is in possession of facts which he has every reason to believe would materially influence the court in acting upon his application, it is his duty to disclose them; and if, from a corrupt motive and with the intention of over-reaching the court, he suppresses them, he is guilty of a wrong. The court is of opinion that the evidence sustains the charge of the petition, and that the guardian in this case sought and did use Tazewell County Court as an instrument to circumvent and evade the power of the Sangamon County Court.

2. POWER OF COURT ON PETITION TO VACATE ITS OWN JUDGMENT.—The court is of opinion that the order of the Tazewell County Court, declaring the proceedings in relation to the appointment of appellee as guardian null and void *ab initio*, was proper, the guardian never having dealt with innocent third parties, and the court having only the rights of the guardian and wards to consider.

ERROR to the Circuit Court of Tazewell county; the Hon. N. M. LAWS, Judge, presiding. Opinion filed August 20, 1885.

Mr. THOMAS C. MATHER and Mr. FRANK H. JONES, for plaintiffs in error; that the suppression of fact in a matter material to be known in a matter pending is both in law and in equity, equivalent to the assertion of falsehood, cited Lockridge v. Foster, 4 Scam. 569; Aortson v. Ridgway, 18 Ill. 23; Jackson v. Wilcox, 1 Scam. 344; Grove v. Hodge, 55 Pa. 504.

The Probate Court of Sangamon county having acquired jurisdiction over the person and the fund and having administered the same for years, would retain it: People v. White, 11 Ill. 348.

The appointment of a guardian in another court would be void: Dorman v. Ogbourne, 16 Ala. 759.

Messrs. PALMERS, ROBINSON and SHUTT, for appellee.

CONGER, J.  On the 21st of February, 1870, John G. Roberts was, by the County Court of Sangamon county, appointed guardian of his two nephews, plaintiffs in error, Wm. E. Pease, born Sept. 9, 1855 and Henry L. Pease, born Dec. 9, 1857, gave bond and received from the former guardian of his wards the sum of $5,371.83.

On the 25th of July, 1870, Hopper and Elliott, two of the sureties upon his bond, petitioned the court that said guardian, John G. Roberts, give a new bond or give them counter security under the statute. Roberts waived service of process, confessed the petition, and on the same day the court made an order in accordance with the prayer of the petition, that Roberts should within ten days give good counter security, or file a new bond. This order was wholly disregarded by Roberts, and on the 3d day of August, 1870, the court ordered that his letters be revoked, and he be removed from his office of guardian.

His two wards were then living in Tazewell county, and on the 29th of August, 1870, he applied to the County Court of Tazewell county to be appointed guardian for his wards by that court, giving to that court no information whatever of the fact of his having been the guardian, or of the former proceedings in Sangamon county.  On the 7th day of September following he procured from Wm. E. Pease a paper signed by him, requesting the appointment of Roberts as his guardian, but which young Pease swears he did not read, nor did he know its contents; and on the same day Roberts also procured his father, Daniel Roberts, and his sister, Mary Pease, the mother of Wm. E. and Henry L. Pease, to sign with himself a bond in the sum of $5,400, both of which papers he presented to the Tazewell County Court.  Neither Roberts nor his sureties had at the time sufficient property to make the bond good.

Mrs. Pease in her testimony says, in reference to her signature to the bond, that her brother, John G. Roberts, asked her to sign some guardian papers, but did not explain their object and meaning, and she signed a paper without knowing what it was, nor did she know at that time anything of the

proceedings in Sangamon county or that her brother was then seeking to be appointed guardian in Tazewell county.

On the day these papers were presented, the Tazewell County Court, in entire ignorance of the proceedings in Sangamon county, and of the insolvency of the parties to the guardian's bond filed, and, taking it for granted that the written nomination of Roberts by Wm. E. Pease was the honest and intelligent choice of the ward, proceeded to issue letters of guardianship to Roberts.

On the 12th of September following, Roberts presented these letters, together with a statement of his account as guardian, showing balance due Wm. E. of $1,379.91 and Henry L. of $1,385.41, to the Sangamon County Court, and at some date not exactly disclosed by the evidence, but between the 7th and 12th of September, wrote the judge of San-gamon County Court a very indecent and insulting letter in reference to the orders of his court, and the use he might make of them.

At this point Roberts seems to have rested from his labor. He never filed in Tazewell county any inventory, account, report or settlement whatever, nor did he make any further report to the Sangamon court, nor pay or attempt to pay his wards the balance due them.

In this condition the affairs of the guardianship remained for over seven years, when, upon the 10th day of December, 1877, the wards filed their petition in the Tazewell County Court, setting forth these various proceedings, charging that the Tazewell county letters had been procured by the practice of fraud and imposition upon that court, praying their can-cellation, and that the proceedings and orders under and by virtue of which they were issued be declared void. Roberts answered the petition, an issue was formed thereon, trial had, and an order entered canceling the letters and bond and de-claring all the proceedings of that court in relation thereto null and void. Upon an appeal to the Tazewell Circuit Court the order and judgment of the county court was reversed and the petitioners, Wm. E. and Henry L. Pease, bring the record to this court for review. Two questions present themselves

by this record: First, was the County Court of Tazewell county justified in finding that the letters issued by that court had been procured by fraud, and secondly, upon being satisfied of this fact, was its power in the premises confined to revoking the letters, leaving the original appointment untouched, or could it vacate and declare the whole proceeding null and void *ab initio.*

Upon the first question, it is urged by counsel for the guardian that he concealed nothing from the Tazewell County Court that the law required him to disclose; that it was not his duty, when applying for letters in Tazewell, to place that court in possession of the proceedings and transactions of another court.

Under ordinary circumstances there might be great force in this suggestion, but we do not regard it so under the facts of this case. It must be remembered that our statute has not fixed any method by which the county court shall proceed when about to appoint a guardian, to ascertain who may be a suitable person, leaving it to be determined by the discretion of the court, and the special circumstances of each case.

Hence it follows when an applicant for letters is in possession of facts which he has every reason to believe would materially influence the court in acting upon his application, it is his duty to disclose them, and if, from a corrupt motive, and with an intention of overreaching the court, he suppresses them, he is guilty of a wrong. We think it apparent that Roberts had reason to believe, and did believe, that if he placed the Tazewell court in possession of all the facts as they existed at the time of his application, he would fail in his object and remain subject to the orders of the Sangamon court, from which he was seeking to escape, and he therefore sought to and did use the County Court of Tazewell as an instrument to circumvent and evade the power of the Sangamon court. If his only object had been to release his sureties, by giving a new bond, it seems reasonable to suppose he would have offered it to the court appointing him, and to which he was responsible, unless it was his intention to release them by fraudulently imposing upon the Tazewell court a worthless

bond.  His father had already been refused as a surety by the
Sangamon court after the other sureties had begun their pro-
ceedings, and taking advantage of the confidence reposed in
him by his sister and her child he procured one to sign his
bond, and the other a written nomination of himself as guar-
dian, both being ignorant of the contents and meaning of the
papers they signed; presented them to the Tazewell court,
knowing at the time that the bond was not good; gave no in-
timation to that court of the proceedings that had occurred in
the county of Sangamon, but procured his letters, and then
having, as he supposed, accomplished the purpose of defeat-
ing the lawful orders of the Sangamon court, gave expression
to the true feelings and motives that actuated him by sending
to the judge of the latter court an insulting message, which,
because of its indecency, can not be here repeated.

If courts can not protect themselves from such impositions
and wrongful practices they will become merely the instru-
ments which designing men may use to carry out their fraud-
ulent schemes.

The evidence, we think, sustains the substantial charge of
the petition.

The order of the Tazewell County Court in declaring the
whole proceedings in relation to the appointment of Roberts
as guardian, null and void *ab initio*, we are inclined, after
a careful consideration of the authorities, to sustain.

Counsel have cited no decisions of our Supreme Court upon
this direct question, nor have we been able to find any.
Those cited refer to the power of removal, which is not con-
troverted, and throw no light upon the power of a court of
law, upon motion or petition, to vacate its own judgments upon
proof of fraud in their procurement.

Freeman on Judgments, Sec. 99, says: "The maxim that
fraud vitiates everything is applicable to judgments; upon
proof of fraud or collusion in their procurement they may be
vacated at any time."

In Brown's Legal Maxims, page 232, the author uses the
following language: "But although the judgments of a court
of competent jurisdiction upon the same matter will, in gen-

eral, be conclusive between the same parties, yet such a judgment may be impeached on the ground of fraud, for fraud in the language of DeGay, O. J., is an extrinsic collateral act, which vitiates the most solemn proceedings of courts of justice. Lord Coke says, it avoids all judicial acts, ecclesiastical or temporal, and in a recent case before the house of Lords, Earl of Bandon v. Beecher, 3 Cl. & Fin. 510, it was observed that the validity of a decree of a court of competent jurisdiction upon parties legally before it, may be questioned, on the ground that it was procured through fraud, contrivance or covin of any description, or not in a real suit, or, if pronounced in a real, substantial suit between parties who were really not in contest with each other." We may add, that, if a judgment be obtained in a superior court clandestinely by abuse of its forms and by deceiving its officers, the defendant against whom it is sought to enforce such judgment may obtain a speedy remedy by applying to have it set aside.

In Elson v. Elson, 108 Mass. 590, Bigelow, O. J., gives expression to the following views:

"To a correct understanding of the points involved in the present case, it is to be borne in mind that the proceeding now before us is a petition by a party to a case, against whom a judgment has been rendered at a former term of this court in another county, asking that said judgment may be set aside and annulled on the ground that it was obtained by fraud. It is, in other words, an application to the court by one party in a suit against the other party to the same suit, to vacate a judgment rendered therein, and not an attempt to avoid the effect of a judgment in a proceeding purely collateral. * * * The question to be determined is whether a judgment, so obtained, can be re-examined and set aside by the party aggrieved by the fraud, or whether it is to be taken as forever binding and conclusive on the rights and obligations of the parties. The statement of the question is of itself sufficient to make it apparent that if there is no remedy by which judgments so procured to be rendered can be impeached and annulled, courts of justice may be made instruments by which

the grossest frauds may be successfully accomplished, to the great wrong and injury of innocent persons. * * * It is no doubt true, that a decree or judgment which stands unreversed and in force can not be called in question or impeached, in collateral proceedings, by one of the parties to the original suit; it is a very different proposition to maintain that an innocent party can not invoke the power of the court by which the original judgment or decree was rendered, to vacate and annul it on the ground that it was procured by fraud practiced on the court to his gross injury.

We believe it to be an established principle of jurisprudence that courts of justice have power, on due proceedings had, to set aside or vacate their judgments and decrees, whenever it appears that an innocent party, without notice, has been aggrieved by a judgment or decree obtained against him without his knowledge, by the fraud of the other party. Nor is the principle limited in its operation to courts which proceed according to the course of the common law.

It is equally applicable to courts exercising jurisdiction in equity, and to tribunals having cognizance of cases which are usually heard and determined in ecclesiastical courts. In tribunals of the last named description, whose decrees can not be reviewed by writ of error or reversed, the proper form of proceeding is by petition to vacate the former decree as having been obtained by fraud upon the party and imposition upon the court. See also Kerr on Fraud and Mistake, p. 293; Pomeroy's Eq. Jur., Vol. Sec. 919; Prudham v. Phillips, 2 Ambl. 763. If, during the time that Roberts' appointment and letters stood unrevoked, other innocent parties had dealt with him upon the faith of such appointment, the power of the county court to absolutely annull and cancel the original appointment, and thereby interfere with or affect the rights of such third persons might well be doubted, but no such question arises upon this record, and we therefore express no opinion upon it.

Under his appointment Roberts never dealt with innocent third parties, nor did anything to affect the rights of others. In determining the proper order to enter, the county court

had only the rights of the guardian and wards to consider; and we think the order it made the proper one under the circumstances, not only with reference to the parties before it, but that it might also protect its own dignity and prevent itself from being made an instrument in the hands of a designing man to accomplish a wrong.

The decision of the circuit court will be reversed and the cause remanded.

Reversed and remanded.